**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE *EX PARTE* APPLICATION, UNDER 28 U.S.C. § 1782, OF PUBLIC JOINT STOCK COMPANY NATIONAL BANK TRUST

23 Misc. 00006

---

**MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE*
APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782 TO
<u>CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS</u>**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

DISCUSSION ........................................................................................................................... 6

    I.   PETITIONER SATISFIES THE STATUTORY REQUIREMENTS OF SECTION 1782 ...................... 7

    II.  THE *INTEL* DISCRETIONARY FACTORS WEIGH IN FAVOR OF GRANTING THE APPLICATION.. 8

    III. NO OTHER FACTORS WEIGH AGAINST THE REQUESTED DISCOVERY ............................... 10

    IV. THE APPLICATION SHOULD BE GRANTED *EX PARTE* ......................................................... 11

CONCLUSION........................................................................................................................ 11

T<small>ABLE OF</small> A<small>UTHORITIES</small>

**Page(s)**

**Cases**

*In re Application of Hornbeam Corp.*,
   No. 14-MC-424, 2014 WL 8775453 (S.D.N.Y. Dec. 24, 2014)............................................10

*In re Application of Malev Hungarian Airlines*,
   964 F.2d 97 (2d Cir. 1992)........................................................................................................10

*In re Bank Otkritie Fin. Corp.*,
   No. 22-mc-50, 2022 WL 2384169 (S.D.N.Y. July 1, 2022)..................................................10, 11

*Brandi-Dohrn v. IKB Deutche Industriebank AG*,
   673 F.3d 76 (2d Cir. 2012).........................................................................................................7

*In re Edelman*,
   295 F.3d 171 (2d Cir. 2002)........................................................................................................7

*In re Godfrey*,
   526 F. Supp. 2d 417 (S.D.N.Y. 2007)........................................................................................7

*Gushlak v. Gushlak*,
   486 F. App'x 215, 217 (2d Cir. 2012) ......................................................................................11

*Intel Corp. v. Advanced Micro Devices*,
   542 U.S. 241 (2004)..................................................................................................6, 7, 8, 9

*Lancaster Factoring Co. Ltd. v. Mangone*,
   90 F.3d 38 (2d Cir. 1996) ...........................................................................................................7

*In re Letter of Request from Boras Dist. Court*,
   153 F.R.D. 31 (E.D.N.Y 1994) .................................................................................................10

**Statutes**

28 U.S.C. § 1782................................................................................................................*passim*

**INTRODUCTION**

By this *ex parte* application, Public Joint-Stock Company National Bank Trust ("NBT" or the "Petitioner") seeks, under 28 U.S.C. § 1782 ("Section 1782"), limited discovery from seven banks– Deutsche Bank Trust Company Americas ("Deutsche Bank"), Bank of New York Mellon, Standard Chartered Bank, UBS AG ("UBS"), Societe Generale USA ("Societe Generale"), JP Morgan Chase Bank NA ("JP Morgan Chase"), and Citibank NA (Citibank) (collectively, the "Banks" or "Respondents") – for use in foreign proceedings.

The origin of this application is a complex fraudulent scheme, which will be the subject of anticipated litigation in the British Virgin Islands ("BVI").  Petitioner will be a party to the litigation and is a victim of the fraud (the "Scheme") perpetrated by the Russian bank B&N Bank ("Binbank"), the Russian businessman Mikail Shishkhanov, and a number of businesses affiliated with Mr. Shishkhanov, with the apparent connivance of a number of commodity brokers and traders.  As detailed more fully below and in the accompanying Declaration of Neil Dooley, the Scheme involved a series of purported commodities transactions among Binbank and the commodity traders; in reality, the commodities trades did not take place, and the scheme allowed Mr. Shishkhanov (and his co-conspirators) to surreptitiously loot Rost Bank, a subsidiary of Petitioner.

The discovery Petitioner seeks consists of correspondent banking records that Petitioner expects will shed light on the full nature and scope of the Scheme.  Petitioner expects that the evidence will be relevant to the anticipated litigation on the merits, in which Russian law will apply.

Courts interpret Section 1782 liberally to support the statutory purpose of assisting foreign tribunals, and, with that purpose in mind, courts in this District routinely authorize

discovery under 28 U.S.C. § 1782 with respect to banking records similar to what Petitioner seeks here.

The Application should be granted.

BACKGROUND

Petitioner attaches the Declaration of Neil Dooley (Jan. 6, 2023) in support of its Application. Petitioner incorporates the Dooley Declaration in full and briefly summarizes key factual background below.

**_The Parties and Other Key Entities_**

Petitioner NBT is a bank regulated and owned by the Central Bank of Russia ("CBR"). Dooley Decl. ¶ 4. NBT was previously owned by another Russian bank, Bank Otkritie. *Id.* ¶ 5. In August, 2017, due to acute financial problems, Bank Otkritie was placed into administration by the CBR and required a $8 billion bailout. Both NBT and Bank Otkritie are now under separate management. *Id.* ¶¶ 5-6.

Rost Bank was merged into NBT on July 2, 2018, after being placed in rehabilitation. *Id.* ¶ 7. Prior to rehabilitation, Rost was owned and controlled by Mikhail Shishkhanov, a Russian businessman. *Id.* Mr. Shishkhanov was also the owner and controller of Binbank. *Id.* ¶ 8. Binbank went into rehabilitation on September 21, 2017, and was later merged into Bank Otkritie. Id.

All of the Conduit Companies involved in the Scheme except one were incorporated in BVI.[1] *Id.* ¶ 10. All of the Conduit Companies were owned or controlled by Mr. Shishkhanov, id., and all have been dissolved or liquidated, id.

---

[1] All of the Conduit Companies are listed in Annex 2 of the Dooley Declaration.

The Traders are companies engaged in international commodities trading.[2]  *Id.* ¶ 11.

Respondent Banks are banks that have been used by the Traders to facilitate the Scheme described below.

***Overview of Scheme***

As set out more fully in the Dooley Declaration, the Traders and Conduit companies orchestrated a fraudulent series of transactions intended to make Binbank appear as though it was involved in profitable lending arrangements with the Traders to finance commodities trades.  *Id.* ¶ 12.  But in reality, there were no such commodities trades.  *Id.* ¶ 13.  Rather, the transactions gave only the appearance of trades while allowing Mr. Shishkhanov and the Conduit Companies to loot Rost Bank before its collapse.  *Id.* ¶ 14.

The Scheme manipulated the basic structures of legitimate trade finance agreements.  In such agreements, the buyer pays for goods by having a bank advance funds to the seller.  *Id.* ¶ 15.  The buyer then is obligated to repay the bank when or shortly after the goods are delivered to it.  *Id.*  The buyer typically obtains a "standby letter of credit," or a de facto guarantee from another bank, to secure the obligation.  *Id.* ¶¶ 15, 35.  The bank enters the transaction to earn fees and interest charges, while a seller gains a means to secure prompt payment.  *Id.*

Here, Binbank entered into import credit agreements with purchasers/Traders unaffiliated with Binbank or Mr. Shishkhanov.  *Id.* ¶¶ 17, 33-34.  Since such an arrangement bore the appearance of arms-length dealing, Russian banking regulations did not require that Binbank maintain sufficient reserves equal to the full amount of the loan.  *Id.*  At the same time, the Trader entered into a separate loan agreement for a slightly smaller amount with a Conduit Company affiliated with Mr. Shishkhanov.  *Id.* ¶¶ 18, 37.  This separate loan typically required

---

[2] All of the Traders are listed in Annex 3 of the Dooley Declaration.

loan proceeds to be disbursed into an Armenian bank account (or bank accounts in other jurisdictions) and transferred via a Respondent Bank as intermediary.[3]  *Id.* ¶ 18, 39.

The loan to a Conduit Company typically had two conditions precedent that tied it to the loan from Binbank.  First, funds from the original import credit agreement had to be transmitted to the seller Trader.  *Id.* ¶ 20.  Second, Binbank was to waive its rights under the import credit agreement and respective security arrangements.  *Id.* ¶¶ 20, 41.

Finally, Binbank and the purchaser Trader entered into an assignment agreement releasing the Trader from obligations under the import credit agreement in exchange for the Trader's commitment to transfer to Binbank all funds it would receive from the Conduit Company under the loan.  *Id.* ¶¶ 21, 44.  The Scheme thus allowed Binbank to become fully exposed to the risk of a loan to an affiliated company without holding the reserves that would otherwise be required.  *Id.* ¶ 22.  And the Traders in the middle were able to pocket the difference between the Binbank import credit agreement and the loan to the Conduit Company.  *Id.* ¶¶ 23, 45.

At no point during this process, however, were commodities actually traded.  Despite the transactions appearing legitimate on the surface, Petitioner has reason to believe the underlying trades never took place.  The parties listed on bills of lading were usually different from those on the supply agreements, key documents were abnormally short, and often the Traders were not registered in the countries where the commodities were being exported and imported.  *Id.* ¶¶ 13, 32.

---

[3] Armenia has very close ties to Russia, and it is common for Armenian banks to be used as transit accounts.  *See* Dooley Decl. ¶ 19.

But the bill had to be paid at some point, and that is where Rost Bank was harmed.  Rost Bank essentially compensated Binbank for the underlying fraudulent agreements through a convoluted series of transactions.  Specifically, Rost Bank (after receiving an interbank loan from Binbank) lent funds to another Shishkhanov-affiliated entity that eventually through a set of intermediaries funneled money to the Conduit Company to repay the Conduit Company's loan to the purchaser Trader.  *Id.* ¶ 25.  In one transaction described in more detail in the Dooley Declaration, these funds were funneled through at least eight Shishkhanov-affiliated entities to complete the loop.  *Id.* ¶ 51.  This last step of the Scheme enabled Binbank to be repaid, as the assignment agreement described above transferred these loan proceeds to Binbank.  *Id.* ¶¶ 21, 25.

But Rost Bank, despite serving as the means for everyone else to get paid, was never itself compensated.  The Scheme involved at least 122 import credit agreements with a total value of $3.3 billion:

| No. | Trader | Number of letters of credit | Value of financing |
|:---:|---|:---:|---|
| 1 | Cargill / Midwestern | 24 | $ 802,385,680.98 |
| 2 | Louis Dreyfus | 26 | $ 665,238,881.61 |
| 3 | Bunge | 14 | $ 436,583,130.85 |
| 4 | Quadra Commodities | 13 | $ 304,854,406.31 |
| 5 | Noble Group (Cross Continental) / COFCO | 7 | $ 226,934,216.52 |
| 6 | Liberty Commodities | 7 | $ 149,790,542.45 |
| 7 | Atlantic | 3 | $ 131,185,058.94 |
| 8 | Xangbo | 5 | $ 99.310,024.58 |
| 9 | Simec | 5 | $ 88,273,155.00 |
| 10 | Wilson | 4 | $ 91,499,860.35 |
| 11 | Intra Asia | 5 | $ 91,497,857.78 |
| 12 | Triumph | 5 | $ 91,493,591.23 |
| 13 | Bering | 3 | $ 70,792,830.00 |
| 14 | Ifchor | 1 | $ 15,105,323.00 |
| **Total** | | **122** | **$ 3,264,944,559.60** |

Petitioner believes that all 122 import credit agreements followed substantially the pattern described above and in the Dooley Declaration.  Discovery of bank records from the Respondent Banks will enable Petitioner to gauge the full scope of the Scheme.

***Anticipated BVI Litigation***

All Conduit Companies but one were incorporated in BVI, which is therefore the most appropriate jurisdiction for claims against them and the Traders.  The BVI litigation will advance claims under Russian law, specifically Articles 1, 10, 1064, and 1080 of the Russian Civil Code. In order to prevail, Petitioner will be required to show (1) the existence of a wrongful act; (2) the occurrence of harm; (3) the causal link between the act of the tortfeasor and the harm; and (4) the intent of the tortfeasor.  Petitioner believes that the Scheme satisfies all of these elements, and banking records from the Respondent Banks will be critical to making its case.

DISCUSSION

Section 1782 provides that "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a foreign or international tribunal," and that such order may be issued "upon the application of any interested person." 28 U.S.C. § 1782.  If these requirements are satisfied, the court may, in its discretion, grant an application for discovery.  The Supreme Court has identified four factors that courts consider in exercising that discretion.  *See Intel Corp. v. Advanced Micro Devices*, 542 U.S. 241, 264-75 (2004).  As set forth below, Petitioner satisfies the statutory requirements for relief under Section 1782, and the discretionary factors weigh in favor of granting the requested relief, as well.

I.      **PETITIONER SATISFIES THE STATUTORY REQUIREMENTS OF SECTION 1782**

A court may grant discovery under Section 1782 if "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Brandi-Dohrn v. 1KB Deutche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012). All of the statutory requirements are satisfied here.

First, Respondents are all found in the Southern District of New York. A respondent is considered to be found in a district if they are physically present there. *See In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002). A company is also found where it is incorporated, headquartered, or where it is engaged in "systematic and continuous activities." *In re Godfrey*, 526 F. Supp. 2d 417, 422 (S.D.N.Y. 2007). In this case, Respondents are all physically located in New York, based on public filings with the SEC. *See* Dooley Decl. Ex. 19.

Second, the discovery sought is for use in foreign proceedings. The Second Circuit has held that a "proceeding" for purposes of Section 1782 must be one "in which an adjudicative function is being exercised." *Lancaster Factoring Co. Ltd. v. Mangone*, 90 F.3d 38, 41 (2d Cir. 1996). The BVI litigation will clearly serve an adjudicative function. The proceeding may be one which is currently pending, or, as the Supreme Court has ruled, "the 'proceeding' for which discovery is sought under § 1782(a) must be in reasonable contemplation, but need not be 'pending' or 'imminent.'" *Intel*, 542 U.S. at 247. Thus, that the BVI litigation has not yet commenced is no bar to relief under Section 1782.

Specifically, the evidence will facilitate Petitioner bringing claims against the Conduit Companies and Traders in BVI under Russian law. Petitioner will assert under Article 1064(1) of the Civil Code of the Russian Federation that the Conduit Companies and Traders are

obligated to compensate Petitioner for damage caused to Petitioner's property.  NBT will need to prove (1) the existence of a wrongful act; (2) the occurrence of harm; (3) the causal link between the act of the tortfeasor and the harm; and (4) the intent of the tortfeasor.  *See* Russ. Civ. C. 1064.

The relevant wrongdoing here is Binbank's breaches of the Russian banking regulations. Rost and Petitioner experienced harm because Rost funded the repayment of the fraudulent loans as a necessary part of the unlawful Scheme.  The causal link to the harm is that, but for the Traders' involvement, it would not have been possible for Binbank to disburse funds to the Conduit Companies directly given their affiliations.  Finally, there is ample evidence of the Traders' intent, including (1) the knowledge that the loans were back-to-back arrangements; (2) the ultimate beneficiaries of the funds – the Conduit Companies – were BVI companies with no known assets or ability to repay the loans and with bank accounts in Armenia; (3) there was never a risk of incurring losses; and (4) the transactions resulted in significant commissions despite the lack of risk.  Petitioner anticipates that the discovery sought under this Application will enable Petitioner to identify the scope of the Scheme as well as potential other participants.

Third, Petitioner is clearly an "interested person" authorized to bring this Application. "No doubt litigants are included among, and may be the most common example of, the 'interested person' who may invoke § 1782."  *Intel*, 542 U.S. at 256.  Petitioner will be a party to the anticipated BVI litigation.

## II.   THE *INTEL* DISCRETIONARY FACTORS WEIGH IN FAVOR OF GRANTING THE APPLICATION

The Supreme Court has identified four factors that a district court should consider when ruling on a Section 1782 request: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding"' (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or

agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264-65.  The Intel factors each weigh in favor of granting the Application and permitting discovery sought under the subpoenas.

First, Respondents will not be parties to or participants in the foreign proceedings.  As the Court in Intel explained, "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Id.* at 264.  Because Respondents would not be participants in the BVI litigation, the information sought under the Application would otherwise be unavailable.  Accordingly, this factor weighs in favor of granting the Application.

Second, BVI courts would be receptive to the assistance of a U.S. court and the discovery sought under the Application.  Nothing in BVI law would preclude the use of the information requested from Respondents, i.e., relevant evidence of wire or banking activity by the Conduit Companies.  Rather, BVI courts would be open to receiving this exact sort of information.  See Dooley Decl. ¶ 60.

Third, the Application does not conceal any attempt to circumvent foreign proof-gathering restrictions.  The Application seeks information that is intended to be used in contemplated foreign proceedings in BVI.  The information being sought (bank records) is a type that is routinely sought, provided, and used in a wide variety of legal proceedings, in BVI and elsewhere.  There are no applicable restrictions under BVI law, and no reason to think that such discovery would circumvent or contravene any relevant proof-gathering restrictions.  This factor also weighs in favor of the requested discovery.

Finally, the information sought under the Application is not unduly intrusive or burdensome.  The subpoenas (attached hereto as Michael Decl. Exs. 1-7) are narrowly tailored to seek relevant information concerning the Conduit Companies' transactions.  Bank records, such as the wire transfer records requested in the subpoenas, are stored as a matter of course and are routinely sought from and produced by banks located in this District under Section 1782.  *See, e.g.*, *In re Bank Otkritie Fin. Corp.*, No. 22-mc-50, 2022 WL 2384169, at *3 (S.D.N.Y. July 1, 2022) ("[T]he sought materials are routinely produced by banks to satisfy discovery requests."); *In re Application of Hornbeam Corp.*, No. 14-MC-424, 2014 WL 8775453, at *1, 5 (S.D.N.Y. Dec. 24, 2014) (noting that "New York Banks routinely receive and comply with similar subpoenas issued pursuant to 28 U.S.C. § 1782" and granting discovery of bank records from, inter alia, Deutsche Bank).  The fourth and final Intel factor thus also weighs in favor of granting the Application.

III.    **NO OTHER FACTORS WEIGH AGAINST THE REQUESTED DISCOVERY**

There are no factors weighing against allowing the requested discovery.  According to the Second Circuit, Section 1782's "twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign courts by example to provide similar means of assistance to our courts" should inform a court's analysis of a Section 1782 application.  *In re Application of Malev Hungarian Airlines*, 964 F.2d 97, 101 (2d Cir. 1992).  Consistent with those aims, courts "should liberally favor assistance to foreign courts" when presented with Section 1782 applications.  *In re Letter of Request from Boras Dist. Court*, 153 F.R.D. 31, 33 (E.D.N.Y 1994).  Here, granting the Application would further both goals of Section 1782 because the discovery sought would assist the petitioner and BVI courts in the anticipated BVI litigation.  Accordingly, the Application should be granted.

**IV.      THE APPLICATION SHOULD BE GRANTED *EX PARTE***

Finally, the Court should grant the Application *ex parte*.  As the Second Circuit has recognized, "it is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*."  *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012).  To the extent Respondents object to the discovery sought, they can "later challenge any discovery request by moving to quash" under Rule 45.  *Id*.; *In re Bank Otkritie*, 2022 WL 2384169, at *2 (same).

**CONCLUSION**

For the stated reasons, Petitioner respectfully requests that this Court grant the Application and authorize service of the subpoenas on Respondents.

Dated: January 10, 2023                           Respectfully submitted,

STEPTOE & JOHNSON LLP

By: */s/ Charles Michael*
        Charles Michael
        Steptoe & Johnson LLP
        1114 Avenue of the Americas
        New York, NY 10036
        (212) 506-3900
        cmichael@steptoe.com

*Counsel for Petitioner*

11
