**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE *EX PARTE* APPLICATION, UNDER 28 U.S.C. § 1782, OF PUBLIC JOINT STOCK COMPANY NATIONAL BANK TRUST | 23 Misc. 00006 |

### DECLARATION OF NEIL DOOLEY

1.      I am an English solicitor and partner at the law firm of Steptoe & Johnson UK LLP ("Steptoe"). I respectfully submit this declaration in support of the application of Public Joint-Stock Company National Bank Trust ("NBT", the "Petitioner") for an order under 28 U.S.C. § 1782 to conduct discovery for use in foreign proceedings.

2.      Specifically, the Petitioner seeks an order authorizing service of subpoenas on the banks listed in Annex 1 (the "Banks") for copies of any orders, instructions, or wire transfers in excess of $50,000 in the period between 1 June 2013 and 30 September 2017, where the paying or receiving party was one of the entities listed in Annex 3 (the "The Traders").

3.      The Petitioner anticipates using the evidence in proceedings that it intends to initiate shortly in the British Virgin Islands ("BVI") against the Conduit Companies and some or all of the parties listed in Annex 3 (the "Traders").

### THE PARTIES

4.      NBT is a Russian bank regulated and majority owned by the Central Bank of Russia ("CBR").

5.      In August 2017, NBT was owned by another Russian bank, Bank Otkritie.  On 29 August 2017, due to acute financial problems, Bank Otkritie was placed into administration by the CBR and required a $8 billion bailout.

6.      As a result of the rehabilitation process, both Bank Otkritie and NBT were taken over by the CBR, and are now under separate management.  Many of the bad and distressed assets of Bank Otkritie were transferred to NBT, and it is now in run-off in Russia.

7.      On 21 September 2017, Rost Bank ("Rost"), another Russian bank, went into rehabilitation, and on 2 July 2018, Rost was merged into NBT.  Prior to rehabilitation, Rost was owned and controlled by Mikail Shishkhanov, a Russian businessman.

8.      Mr. Shishkhanov was also the owner and controller of B&N Bank ("Binbank"), another Russian Bank.  Binbank went into rehabilitation on 21 September 2017 and was later merged into Bank Otkritie.

9.      As at the date of this declaration, the Petitioner (NBT) is not a designated entity. Bank Otkritie is currently a designated entity, whilst the CBR is subject to limited sanctions concerning dealings in Russian sovereign debt and securities, but those sanctions do not extend to its ownership of NBT.

10.      All of the Conduit Companies except one were incorporated in BVI.  All of the Conduit Companies have been liquidated or dissolved.  The Petitioner believes that all of the Conduit Companies were owned or controlled by Mr. Shishkhanov.

11.      The Traders are companies engaged in international commodities trading.

## INTRODUCTION

12.      As detailed below, the Traders and Conduit Companies engaged in an unlawful scheme (the "Scheme") intended to give the impression that Binbank was involved in profitable arm's length lending arrangements with the Traders to finance commodities trades.

13.      In reality, the Petitioner believes that there were no commodities trades.  The Scheme involved transactions between related companies, the purported parties to the trades not

appearing on bills of lading, unexplained inconsistencies in shipment sizes, and lack of confirmation that goods were ever actually exchanged.

14.     Rather, the Scheme enabled Mr. Shishkhanov and his controlled Conduit Companies to surreptitiously loot Rost Bank before its collapse.

15.     In a legitimate trade finance agreement, the buyer pays for goods by having a bank advance funds to the seller. The buyer, in turn, becomes obliged to repay the bank once (or shortly after) the goods are delivered to it. The buyer's obligation to repay the bank is often secured by a "standby letter of credit," *i.e.*, a *de facto* guarantee from another bank. The commercial rationale for a bank in a trade finance transaction is to earn fees and interest charges. For the seller, trade finance provides a means to secure payment, and to do so sooner than it might otherwise be paid for the goods, albeit at a discount.

16.     The Scheme here manipulated each step of this traditional arrangement through a convoluted series of transactions, which had many of the characteristics summarized below.

17.     In the first part of the Scheme, Binbank entered an import credit agreement with a Trader unaffiliated with Binbank or Mr. Shishkhanov.  Since this transaction was not, on the surface, between affiliated entities, Russian banking regulations did not require that Binbank maintain sufficient reserves, which would have been equal to the full amount of the loan had it been with a related party.  Further, such a transaction was not subject to the limits on funds that a Russian bank can provide to affiliated or connected entities.

18.     Parallel to this transaction, the purchaser Trader entered into a separate loan agreement for a slightly smaller amount with a Conduit Company, which was (as described above) under the control of Mr. Shishkhanov.  Many of these loan agreements called for loan proceeds to be disbursed into an Armenian bank and transferred via an intermediary bank.

19.     I am aware that Armenia has very close ties to Russia and that banks in Armenia are often used as transit accounts by Russian entities.

20.     The loan agreement with a Conduit Company typically had two conditions precedent.  First, funds from the original import credit agreement had to be transmitted to the seller Trader.  Second, Binbank was to waive its rights under the original import credit agreement and respective security arrangements.  These conditions precedent confirm that this was a back-to-back arrangement.

21.     To complete the loop, Binbank and the purchaser Trader entered into an assignment agreement, in which Binbank released the Trader from obligations under the original import credit agreement in exchange for the Trader's commitment to transfer to Binbank all funds it would receive from the Conduit Company.

22.     Thus, Binbank became fully exposed to the risk of a loan to an affiliated, offshore entity (the Conduit Company) without holding the required reserves or reporting the risk in its accounts or regulatory filings.

23.     The Traders also benefited.  The Traders received the difference between the financing from Binbank and the loan amount transferred to the Conduit Company, without assuming any risk.

24.     By the second part of the Scheme, Rost essentially compensated Binbank for the underlying fraudulent agreements. In other words, Rost was left holding the proverbial bag.

25.     Specifically, after receiving an interbank loan from Binbank, Rost lent funds to another entity affiliated with Mr. Shishkhanov the proceeds of which were eventually funneled to the Conduit Company to ultimately repay the purchaser Trader, which, through the assignment agreement, meant that Binbank was repaid.

26. In all, the Scheme involved 122 import credit agreements with a total value of $3.3 billion as follows:

| No. | Trader | Number of letters of credit | Value of financing |
|---|---|---|---|
| 1 | Cargill / Midwestern | 24 | $ 802,385,680.98 |
| 2 | Louis Dreyfus | 26 | $ 665,238,881.61 |
| 3 | Bunge | 14 | $ 436,583,130.85 |
| 4 | Quadra Commodities | 13 | $ 304,854,406.31 |
| 5 | Noble Group (Cross Continental) / COFCO | 7 | $ 226,934,216.52 |
| 6 | Liberty Commodities | 7 | $ 149,790,542.45 |
| 7 | Atlantic | 3 | $ 131,185,058.94 |
| 8 | Xangbo | 5 | $ 99.310,024.58 |
| 9 | Simec | 5 | $ 88,273,155.00 |
| 10 | Wilson | 4 | $ 91,499,860.35 |
| 11 | Intra Asia | 5 | $ 91,497,857.78 |
| 12 | Triumph | 5 | $ 91,493,591.23 |
| 13 | Bering | 3 | $ 70,792,830.00 |
| 14 | Ifchor | 1 | $ 15,105,323.00 |
| **Total** | | **122** | **$ 3,264,944,559.60** |

27. Attached as Exhibits 1-14 to this Declaration are records reflecting import credit agreements believed to be fraudulent involving each of the Traders listed above.

28. For the purposes of clarity and length, I will in this Declaration describe in detail one such arrangement, involving entities that are part of the Cargill Group.

29. The Petitioner believes that all 122 import credit agreements followed substantially the same pattern. Further, the Petitioner believes that the Traders were aware of the fraudulent nature of the import credit agreements, or that the Traders turned a blind eye.

## REPRESENTATIVE TRANSACTION: CARGILL AND MIDWESTERN

*Part I*

30.     On 11 November 2016, Traders Cargill Financial Solutions ("Cargill FS") and Midwestern Trading Group Inc. ("Midwestern"), entered into a supply agreement numbered CFST002.17 ("Supply Agreement"). A true and correct copy of the Supply Agreement is attached hereto as Exhibit 15.  Cargill and Midwestern are affiliated U.S. companies that are part of the Cargill Group, which describes its business on its website as "provid[ing] financial solutions that facilitate trade and mitigate trade-related risks for companies doing business in emerging and developed markets."[1]

31.     Under the Supply Agreement, Cargill FS (as seller) agreed to supply Midwestern (as purchaser) 34,982,748 metric tonnes of Gasoil from Riga (Latvia) and 100,099,994 metric tonnes of Russian Export Blend Crude Oil from Ust-Luga (Russia) to Amsterdam or Rotterdam (Netherlands).  The consideration under the Supply Agreement was $44,646,083.41.  The parties agreed that Midwestern would make a payment for the delivery before 17 May 2017.

32.     According to public shipping records, the vessels referenced in the Supply Agreement (MT Hafnia Soya and MT Pelagos) operated between the indicated ports in November 2016.  However, there is ample reason to believe that the underlying shipments did not take place as per the underlying documents:

   a.   The sales arrangement is between two related parties, as both Cargill FS and Midwestern are both part of the Cargill Group with headquarters at the same address in Hopkins, MN;

   b.   The parties listed on the bills of lading are not parties to the supply agreement;

---

[1] *See* Cargill, Trade & Capital Markets,
https://www.cargill.com/cs/Satellite?c=Page&childpagename=CCOM%2FPage%2FCCOM%2FCCOM_GeneralPage%2FNav1Layout&cid=1432094477209&pagename=CCOM_Wrapper.

    c.   The delivery of Gasoil is split into several small shipments despite taking place on the same date and using the same vessel;

    d.   The Supply Agreement is unusually short for a transaction of this nature;

    e.   Neither Cargill FS nor Midwestern is registered in Russia, Latvia, or the Netherlands, despite those being countries of shipment, loading, and discharge; and

    f.   The Petitioner has located no record of the actual delivery of the goods presented to Binbank.

33.    Midwestern was required to arrange a letter of credit within 20 days and that payment under the letter of credit was to be made within 180 days on presentation of various bills of lading.  To finance the purported trade, Midwestern entered into ICA290 with Binbank. A true and correct copy of ICA290 is attached hereto as Exhibit 1.

34.    Under ICA290, Binbank made available a line of credit for up to $44,646,083.41 for the benefit of Cargill FS upon receipt of documents to confirm that Cargill FS had fulfilled its obligations to supply the goods, and the receipt of funds by Cargill FS settled the obligations owed to it by Midwestern.

35.    Midwestern's obligations under ICA290 were secured by the following:

    a.   On 23 December 2016, on the application of Midwestern, Credit Suisse issued a "Standby" letter of credit to Binbank for not less than $44,646,083.41 ("CS Guarantee"); and

    b.   Cargill Incorporated provided a guarantee to Binbank for the obligations of Midwestern ("Cargill Guarantee").  The liability under the Cargill Guarantee was limited to $45,315,774.66.

36.    On 27 December 2016, Binbank made available $43,658,288 to Cargill FS. This amount is less than the "nominal" amount of the letter of credit ($44,646,083.41) because Cargill FS agreed to apply a discount in exchange for immediate receipt of funds.

37.    In parallel with ICA290, Midwestern entered into a loan agreement dated 21 December 2016 and numbered ILC-290/1216/MC ("Diamond Loan") with Diamond Forca

Limited ("Diamond"), a BVI-incorporated Conduit Company believed to be affiliated with Mr. Shishkhanov.  A true and correct copy of the Diamond Loan is attached hereto as Exhibit 16.

38.     Under the Diamond Loan, Midwestern lent Diamond $42,907,409.15.  Diamond agreed to repay the loan on 21 June 2017 with an interest rate of 11.48% per annum.

39.     The Diamond Loan proceeds were to be disbursed to Diamond's account at Anelik Bank CJSC, Armenia (which rebranded to become ID Bank in June 2018).  Those funds were to be transferred via Citibank NA as intermediary bank.  All repayments were to be made to Midwestern's account at Citibank NA.

40.     Both ICA290 and the Diamond Loan contain "290" in their title.  The ties between the two documents do not end there.  Under clause 10(a) of the Diamond Loan, it was a condition precedent that Cargill FS received funds from Binbank under ICA290 before funds were advanced to Diamond, showing that this was a back-to-back arrangement.  And although the Diamond Loan was supposedly between a U.S. and BVI company, it was made in a bilingual English/Russian form.

41.     In addition, there were two other conditions precedent in the Diamond Loan: the waiver of the Cargill Guarantee and the CS Guarantee.  The waiver of these guarantees rendered them meaningless.

42.     A true and correct copy of Binbank's waiver of the guarantees, dated 3 July 2017, is attached hereto as Exhibit 17.

43.     To illustrate the correlation between the two transactions with respect to amounts of funds transferred and dates, the following table shows the interest payable under ICA290 and the interest payable under the Diamond Loan:

| Loan | | Letter of credit | |
|---|---|---|---|
| Amount | Date | Amount | Date |
| $ 223,230.42 | 12 January 2017 | $ 223,230.42 | 13 January 2017 |
| $ 223,230.42 | 30 March 2017 | $ 223,230.42 | 31 March 2017 |
| $ 1,961,894.67 | 21 June 2017 | $ 223,230.42 | 22 June 2017 |

44.     To close out the Cargill side of the transaction, on or about 27 December 2016, Binbank and Midwestern executed an assignment agreement by which Midwestern's rights under the Diamond Loan were assigned to Binbank ("Assignment Agreement").  The Petitioner has not been able to locate the Assignment Agreement but believes that it must exist, as such agreement is necessary to enable Cargill FS and Midwestern to enter the arrangements on a "risk-free" basis.  Further, the Petitioner has located similar assignment agreements for identical letter of credit arrangements. A true and correct copy of such an assignment agreement, between Binbank and Midwestern dated 27 January 2017 and numbered ILC-300/0217/MC, is attached hereto as Exhibit 18.

45.     As a result of these transactions, neither Cargill FS nor Midwestern had any risk in the transactions despite each receiving substantial benefits.  Cargill FS received $43,658,288 from Binbank and transferred to Diamond only $42,907,409.15.  This amounts to $750,869.68 in profit.

46.     In contrast, Binbank, rather than being the beneficiary of (i) a letter of credit payable by a Cargill entity, (ii) a guarantee from a Cargill company; and (iii) a standby letter of credit from an international bank (Credit Suisse), was left with the right to a claim against

Diamond, a BVI company with no known assets (BVI companies do not need to file public accounts) and no obvious means to repay the loan. The only rationale for Binbank to take on this risk was because that it (or more likely senior management controlled by Mr. Shishkhanov) also controlled Diamond.

47.     Once the funds were transferred to Diamond at its account in Armenia, there is no information as to what happened to those monies next. It is likely that they were used for various purposes including (i) for the personal benefit of Mr. Shishkhanov and his associates; and (ii) to recycle and to be used to service other loans (and thus conceal the fact that other borrowers could not service their loans). This is a process that is called "balance sheet management," which is a euphemism for misstating accounts by concealing bad debts. In another case involving NBT in the English Commercial Court, a judge described "balance sheet management" as a "Ponzi scheme with a fancy name."[2]

48.     The Petitioner is not specifically aware of Diamond's financial standing during the relevant period, but I understand from NBT that a direct unsecured loan from Binbank to Diamond would likely qualify for 100% of reserves for Binbank, meaning this is not a loan that Binbank (or any commercial bank) would ever have made in the normal course of business. By arranging the Scheme, it would appear to an outside party (including Binbank's auditors or the CBR) that the credit risk was small as the borrower was a subsidiary of a respected international trading group (Cargill) and there was excellent security in the form of the CS Guarantee and the Cargill Guarantee. The reality was different.

49.     Finally, it appeared that Binbank was making a large fee for providing the credit facilities and that it was also earning healthy interest, but this was entirely illusory. The apparent

---

[2] NBT v Yurov [2016] EWHC 1913 at [11].

"benefit" of Binbank in result of the transaction amounted to $1,657,485.85 (*i.e.*, $669,691.25 in interest and $987,794.60 as being the discounted loan at 4.5% of loan value).

*Part II*

50.    The next part of the Scheme required repayment of the Diamond Loan.  Under the Diamond Loan, Diamond agreed to repay Midwestern as follows:

| Loan | | |
|---|---|---|
| **Amount** | **Date** | **Description** |
| US$ 22,230.42 | 12 January 2017 | Interest |
| US$ 223,230.42 | 30 March 2017 | Interest |
| US$ 1,961,894.67 | 21 June 2017 | Interest |
| <u>US$ 42,907,409.15</u> | 21 June 2017 | Principal debt |

51.    To enable Diamond's repayment, there was a series of linked transactions, the combined effect of which was for Rost to take a loss:

  a.    On 15 June 2017, Binbank transferred to Rost RUB 4,650,000,000 (about $75 million) by way of an interbank loan (ticket No 27039012).  Rost repaid the interbank loan with funds received from CBR on 15 March 2018 in the course of insolvency prevention measures.  Those funds are repayable by 15 March 2023.

  b.    On 15 June 2017, Rost transferred to Digital Invest (a company affiliated with Mr. Shishkhanov) $74,568,693 as consideration for 74,568,693 bonds issued by Belyrian Holdings Limited (BELR_USD_2025 CY0146110214) and $1,583,720 as coupon income of the bonds under a sale and purchase agreement between Rost and Digital Invest.  Belyrian Holdings is a Cypriot company controlled by Mikhail Gutseriev, who is prominent Russian businessman and a close relative of Mr. Shishkhanov.

  c.    On 16 June 2017, Digital Invest transferred to Burglen Finance Limited RUB 4,370,000,000 (ca. $76.6 million as of 15 June 2017) under a loan agreement

between Digital Invest and Burglen Finance Limited (which is another company affiliated with Messrs. Gutseriev and Shishkhanov company).

d. On 21 June 2017, Burglen Finance Limited transferred to Merahall Holdings Limited and Beristor Holdings Limited EUR 35,283,000 (ca. $39.56 million) under loan agreements made between (1) Burglen Finance Limited and Beristor Holdings Limited and (2) Merahall Holdings Limited and Beristor Holdings Limited. The Petitioner understands all of these companies to be owned or controlled by Mr. Shishkahnov and his associates.

e. On 21 June 2017, Beristor Holdings Limited and Merahall Holdings Limited both transferred to Stonebury Limited EUR 35,283,000 under so called shareholder contribution agreements made (1) between Beristor Holdings Limited and Stonebury Limited and (2) Merahall Holdings Limited and Stonebury Limited. The Petitioner understands all of these companies to be owned or controlled by Mr. Shishkahnov and his associates.

f. On 21 June 2017, Stonebury Limited transferred to Fleargate Enterprises Limited EUR 70,566,000 under a loan agreement between Stonebury Limited and Fleargate Enterprises Limited. The Petitioner understands all of these companies to be owned or controlled by Mr. Shishkahnov and his associates.

g. On 21 June 2017, Fleargate Enterprises Limited transferred to Diamond EUR 70,566,000 under the loan agreement between Fleargate Enterprises Limited and Diamond.

h. On 21 June 2017, Diamond repaid to Midwestern $44,869,313.82 under the Diamond Loan. This amount included principal of $42,907,409.15 and interest of $1,961,904.67.

i. On 22 June 2017, Midwestern transferred to Binbank $44,869,313.82 in settlement of the obligations ICA290, thereby completing the transaction.

52.     Thus, Rost ultimately both repaid the interbank loan from Binbank and also paid the underlying debt, but was never itself repaid.

## ANTICIPATED PROCEEDINGS

53.     All but one of the Conduit Companies were incorporated in BVI, and the Petitioner believes that BVI is the most appropriate jurisdiction in which to bring any claims against the Conduit Companies and the Traders.

12

54.    The anticipated proceedings will advance claims under Russian law, specifically articles 1, 10, 1064, and 1080 of the Russian Civil Code, with which I am familiar.

55.    Under article 1064 (1) of the Civil Code of the Russian Federation, damage caused to the person or property of a citizen, as well as damage to the property of a legal entity, must be compensated in full by the person who caused the damage.  Under Article 1080 (1) of the Civil Code of the Russian Federation, the persons who jointly caused the damage are jointly and severally liable to the injured party.

56.    NBT will make the case that the Traders are liable to compensate NBT for the losses caused to Rost under the Scheme because the Scheme was only possible with the active involvement of the Traders, even if the Traders did not have actual knowledge of the underlying fraud.

57.    It will be necessary for NBT to prove

a.  the existence of a wrongful act;

b.  the occurrence of harm;

c.  the causal link between the act of the tortfeasor and the harm; and

d.  the intent of the tortfeasor.

58.    In this case, the relevant wrongdoing is Binbank's breaches of the Russian banking regulations (and Binbank's management's breaches of duty in facilitating such transactions).  Rost experienced harm because it funded the repayment of the "loans" through Part II of the Scheme described above.  The causal link is that, but for the involvement of the Traders, it would not have been possible for Binbank to disburse funds to the Conduit Companies directly.  Finally, a number of facts evidence the Traders' intent, including (i) their knowledge that this was a back-to-back arrangement, (ii) the ultimate beneficiary of the monies

was a BVI company with no known assets or ability to repay the loan and with a bank account in

Armenia; (iii) they were never at any stage at risk of incurring losses; and (iv) significant

commissions were earned for no risk.

## THE BANKS' CONNECTION TO THE SCHEME

59.     The Petitioner believes that the Banks will have relevant information because they

acted as US$ correspondent banks in a number of the transactions.  The following table shows

the banks linked to transactions between Binbank and the Traders as well as, where information

is available, between the Traders and Conduit Companies:

| US Bank | Trading Companies involved in transaction | Conduit Companies involved in transaction |
|---|---|---|
| Deutsche Bank Trust Company Americas | Triumph Commodities PTE. Ltd | Dana Overseas Ltd |
| | Intra Asia Trading PTE Ltd | Dana Overseas Ltd |
| | Xangbo Global Markets PTE Ltd | Diamond Forca Ltd |
| | Xangbo Global Markets PTE Ltd | Darman Finance Ltd |
| | Cross Continental Ltd | Dana Overseas Ltd |
| | Cross Continental Ltd | Anerson Holdings Ltd |
| | Atlantic Industrial and Trading PTE Ltd | Dana Overseas Ltd |
| Bank of New York Mellon | Quadra Commodities | Dana Overseas Ltd |
| | Louis Dreyfus Group | Dana Overseas Ltd |
| | Bunge SA | Garland Solutions Ltd |
| | Bunge SA | Rabalo Ltd |
| | Liberty Commodities | Reachway Overseas Ltd |
| Standard Chartered Bank | Quadra Commodities | Olyserve Inc |
| UBS AG | Quadra Commodities | Olyserve Inc |
| Societe Generale USA | Louis Dreyfus Group | Blanche Union Ltd |
| JP Morgan Chase Bank NA | Louis Dreyfus Group | Blanche Union Ltd |

60.     Records from the Banks will enable the BVI Court to ascertain the full extent of

wrongdoing by the Conduit Companies and Traders as well as damage to Rost and the Petitioner.

61.     Copies of SEC filings showing that each of the Banks is located in New York are

attached as Exhibit 19.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: London, England

January 6, 2023

_____

Neil Dooley

## Annex 1 – The US Banks

### Current accounts:

i.      Citibank NA

ii.     JP Morgan Chase Bank N.A.


### Correspondent bank accounts:

i.      Deutsche Bank Trust Company Americas

ii.     The Bank of New York Mellon

iii.    UBS AG

iv.     Standard Chartered Bank

v.      Societe Generale

vi.     JP Morgan Chase Bank N.A.

vii.    Citibank NA

**Annex 2 – The Conduit Companies**

| Name | Place of Incorporation | Company number | Current status | Date of Incorporation |
|---|---|---|---|---|
| Crambe Asset Holdings Corp | BVI | 1417216 | Liquidated on 22 December 2016 | 06 July 2007 |
| Olyserve Inc | BVI | 1876069 | Liquidated on 15 June 2020 | 29 May 2015 |
| Rabalo Limited | BVI | 1795772 | Liquidated on 19 December 2017 | 23 October 2013 |
| Reachway Overseas Ltd | BVI | 1778845 | Liquidated on 1 March 2017 | 18 June 2013 |
| Ifchor SA (previously called Hansberg Finance Ltd) | BVI | 1533733 | Liquidated on 5 December 2016 | 2 June 2009 |
| Frowell Holdings Ltd | BVI | 1540373 | Liquidated on 13 April 2018 | 16 July 2009 |
| Garland Solutions Ltd | BVI | 1874712 | Liquidated on 20 April 2018 | 20 May 2015 |
| Diamond Forca Ltd | BVI | 1870263 | Liquidated on 30 May 2018 | 16 April 2015 |
| Darman Finance Limited | BVI | 1508311 | Liquidated on 2 November 2018 | 24 October 2008 |
| Blanche Union Ltd | BVI | 1876095 | Liquidated on 18 June 2018 | 29 May 2015 |
| Dana Overseas Ltd[3] | BVI | 1803345 | Liquidated on 30 March 2020 | 17 December 2013 |
| Anerson Holdings Limited | Cyprus | HE268772 | Dissolved on 16 May 2018 | 11 June 2010 |

---

[3] The reference to Dana Overseas Ltd and Anerson Holdings Limited as Conduit Companies is based on the assumption that they might receive funds from the Traders ("outward transfer"). This assumption derives from the fact that both Dana Overseas Ltd and Anerson Holdings Limited made transfers to repay the loans ("inward transfers").

**Annex 3 – The Traders**

| | Trading companies | Jurisdiction | Registration number | Addresses |
|---|---|---|---|---|
| 1. | Credit and Trading Company Ltd | UK | 06458824 | Room 13, 65 London Wall, London EC2M 5TU |
| 2. | Bunge SA | Switzerland | CH-020.3.915.530-2 | 13 Route de Florissant CH 1211, Geneva 12, Switzerland |
| 3. | Louis Dreyfus Commodities Asia / Louis Dreyfus Company Asia | Singapore | 199306551Z | 12 Marina Boulevard, Marina Bay Financial Center, Tower 3 33-03, 018982 Singapore |
| 4. | Louis Dreyfus Commodities Suisse / Louis Dreyfus Company Suisse SA | Switzerland | NVFY7J3BRKK56Q11HF07 | 29 Roite de l'Aeroport, 1215-Geneva, Switzerland |
| 5. | Cargill Financial Solutions | USA | 549300ST2YOGZ1S5QM17 | 9350 Excelsior Blvd, MS 142-4B, Hopkins MN, 55343 USA (Headquarters Address) C/O C T Corporation System, 208 So Lasalle St, Suite 814, Chicago Us-Il Us 60604 (Legal Address) |
| 6. | Midwestern Trading Group Inc. | USA | 549300NKCD7PNH5D9S80 | 9350 Excelsior Blvd, MS 142-4B, Hopkins MN, 55343 USA |
| 7. | Cargill, Incorporated | USA | 286124 | Registered Office Address: 5200 Willson Road #150, Edina, MN 55424, USA |
| 8. | Quadra Commodities Singapore | Singapore | 201210410Z | 28C Stanley Street, 068737 Singapore / 1 George Street, #07-04, One George Street, Singapore 049145 |
| 9. | Quadra Commodities SA | Switzerland | CH-660.1.795.010-5 | Route de Florissant 81, 1206-Geneva, Switzerland / rue Albert-Gos 10, 1206 Genève |
| 10. | New Resources International SA[4] (previous name: Noble Resources International SA) | Switzerland | CHE-109.282.756 | Marktstrasse, 7a, Sarnen, 6060 Switzerland |
| 11. | Cross Continental Trading Limited[5] | UK | 06642662 | 33 Cavendish Square, London W1G 0PW |

[4] In liquidation.
[5] Dissolved on 31 May 2022.

18

| | | | | |
|---|---|---|---|---|
| 12. | Paras Metallics PTE Limited | Singapore | 201212922Z | 171 Tras Street, HEX04-171A, Union Building, 079025, Singapore |
| 13. | Liberty Commodities Limited | UK | 03349135 | 7 Hertford Street, London W1J 7RH |
| 14. | Pearl River Delta Trading (Hong Kong) Limited | Hong Kong | 1457061 | Room 1607, Dominion Centre, 43 Queen's Road East, Wanchai, Hong Kong |
| 15. | Xangbo Global Markets Pte Ltd | Singapore | 200713446E | 3601 OCBC Centre, 65 Chulia Street, Singapore, 049513 |
| 16. | Emporium Trade Pte. Ltd. (previous name: Pan Asia Commodities) | Singapore | 201411204E | Level 30 Six Battery Road, 049909, Singapore |
| 17. | Simec Group | Hong Kong | 1651874 | 2202-2204, Gloucester Tower, the Landmark Building, 11 Pedder Street, Central, Hong Kong |
| 18. | Wilson International Trading Private Limited | Singapore | 198101445C | 8 Temasek Boulevard, 17-02/03 Suntec Tower 3, Singapore 038988 |
| 19. | Intra Asia Trading Pte Ltd[6] | Singapore | 199402508K | 1 Raffles Place, 39-02, Singapore 048616 / WILKIE ROAD, #03-08, WILKIE EDGE, SINGAPORE 228095 |
| 20. | Triumph Commodities Pte. Ltd (Triumph Metals And Minerals Pte. Ltd) | Singapore | 201005850E | One Raffles Place, Tower 2 No 27-61A, Singapore 048616 |
| 21. | Alphatrade International Limited | Hong Kong | 1741949 | Unit 2005, 248 Queen's Road East, Wanchai, Hong Kong |
| 22. | Atlantic Industrial and Trading Pte. Ltd | Singapore | 201105859G | 8 Eu Tong Sen Street, 22-82 the Central, Singapore 059818 |
| 23. | Bering Trading Limited | Hong Kong | 1542441 | Suite 503, Tower 2 Lippo Centre, 89 Queensway Admiralty, Hong Kong |
| 24. | Ifchor (Switzerland) SA (previous name: Ifchor S.A.) | Switzerland | CH55000761415 | Place Pepinet 1, 1003 Lausanne, Switzerland |
| 25. | LDC Trading & Service | Uruguay | 966018574 | Luis Bonavita 1294, Of 901, Montevideo, Uruguay |

[6] In Liquidation - Compulsory Winding Up (Insolvency).